UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| RASHAAD HOGAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:22-cv-00294-JMS-MJD |
| ) | |
| FRANK VANIHEL, et al., ) | |
| ) | |
| Defendants. ) | |

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Rashaad Hogan alleges in this civil action that Defendants routinely denied him access to cleaning supplies and left his housing unit filthy with sewage water, black mold, and pests which interfered with his ability to pray according to his faith. He alleges that they provided him with inadequate cleaning supplies and ensured that he was the last sanitation worker to receive them because of his race. Based on these claims, the Court allowed First, Eighth, and Fourteenth Amendment claims to proceed against Defendants, as well as a claim for injunctive relief against the Warden in his official capacity under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1(a). Dkt. 7, Screening Order. Defendants have moved for summary judgment. Dkt. [49]. For the reasons below, that motion is **DENIED in part and GRANTED in part**.

**I.
Standard of Review**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable

to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Khungar*, 985 F.3d at 572–73.

### A. Conditions of Confinement

During all times relevant, Defendants were correctional staff employed at WVCF.[1] Dkt. 5 at 2-6. From February of 2021 through December of 2022, Mr. Hogan was housed in the Secure

---

[1] (1) Defendant Vanihel was the Warden; (2) Defendant Vinardi was a Deputy Warden; (3) Defendant Gilmore was the Deputy Warden of Re-Entry; (4) Defendant Russell was a Major; (5) Defendant Holcomb was a Lieutenant; (6) Defendant Wellington was a Facility Policy Manager; (7) Defendants Templeton and

2

Confinement Housing Unit ("SCU"), a restricted status housing unit. Hogan Deposition,[2] dkt. 50-1 at 9-10; dkt. 50-2 at 1-2. While in the SCU, Mr. Hogan held a job as an inmate detail worker and identified as a practicing Muslim. Dkt. 50-1 at 37-38, 81-82. Islam mandates that adherents pray five times per day and engage in worship and food consumption under conditions free from "impurities." Dkt. 50-1 at 35-36, 38, 59, 68. Mr. Hogan generally had access to cleaning supplies upon request on cleaning nights which occurred at least twice per week. Dkt. 50-3 at 2. He also received cleaning supplies nightly to perform his detail worker duties. *Id*. He had access to soap and water in his cell except when the water supply was turned off during floods. Dkt. 50-3 at 5. Despite this access to cleaning materials, his cell was often too dirty to allow him to complete his prayers at the appointed times. Mainly, his religious practices were disrupted by flooding, but also bugs and rodents that infested the unit after meal trays were not collected in a timely manner after meals. Dkt. 50-1 at 48, 73-74, 76-80.

While in the SCU, Mr. Hogan's cell flooded approximately 50 times.[3] Sometimes he had to stay in his cell for several hours with his floor covered in sewage water. *Id*. at 28-30, 54-55; dkt. 50-5 at 8. Clean-up delays occurred for many reasons, including the need to prioritize security issues and meal service over cleaning. Dkt. 50-3 at 6. Usually, Defendants would eventually clean the flooded cells or provide inmates with supplies to sanitize their own cells after the water was removed, but on several occasions, Defendants neither sanitized Mr. Hogan's cell nor provided him with the supplies to do so himself. Holcomb Affidavit, dkt. 50-3 at 7; dkt. 50-1 at 56-57; dkt. 50-5 at 8, 17, 167. Defendants contend that they were sometimes unable to provide cleaning

---

Crichfield were Grievance Specialists; (8) Defendants Manley, Leffler, and Keys were Sergeants; (9) Defendant Hendrix was the Supervisor of Sanitation; and (10) Defendants McJean, Kellums, Corwick, Stevenson, Jackson, Dressler, Whippo, Terry, Hill, Hall, Pigg, Lifford, and Chesterfield were Officers.
[2] The page numbers of the pdf and the transcript itself differ by one. For ease of reference, the Court cites to the pdf page numbers, rather than the pages numbers printed on the original deposition transcript.
[3] Mr. Hogan did not cause the flooding. Dkt. 50-1 at 20-21.

supplies to inmates because they were unavailable, and that when they were available, Defendants "had no obligation to rinse or cleanse the supplies prior to delivering them to the next inmate." Dkt. 50-3 at 2, 5.

The parties dispute whether Mr. Hogan could have used his extra clothing as "makeshift cleaning rags" when he did not have access to other cleaning supplies. Dkt. 50-3 at 5. Defendants assert that inmates could use their extra clothing to clean up sewage water. *Id*. But Mr. Hogan contends that using his clothes to clean up after a flood put him at risk of disciplinary charges for destroying state property. Dkt. 55 at 1.

Sometimes, officers would serve meals to Mr. Hogan in his cell while his cell was flooded with sewage. Dkt. 50-1 at 33. At those times, the water would be turned off, so Mr. Hogan could not wash his hands before eating. Bugs, gnats, and rodents infested the SCU, attracted by the presence of sewage and meal trays that were sometimes left uncollected by staff after mealtimes. *Id*. at 48-49, 73-74, 76-80.

On November 5, 2021, Mr. Hogan noticed black residue growing on the vent above the sink in his cell. See *Id*. at 89-90. He suspected that it was mold and submitted a grievance. Dkt. 50-5 at 95. Mr. Hogan did not indicate in the grievance that he had suffered any harm from the suspected mold, however he testified during his deposition that he suffered headaches, difficulty breathing or worsened asthma, nose bleeds, and high blood pressure from the exposure. Dkt. 50-1 at 92-94.

In response to the grievance, Defendant Holcomb sent Defendant Hendrix to inspect the chase next to Mr. Hogan's cell. Defendant Hendrix concluded that there was no evidence of mold and identified the black residue as a buildup of dust or dirt. *Id*. at 90. Defendant Holcomb relayed

these findings to Mr. Hogan and advised him to utilize the cleaning supplies distributed on cell cleanup nights to eliminate the grime. *Id*.

On April 3, 2022, a mold expert inspected the SCU. By this time, Mr. Hogan was housed in a different cell in the SCU and the mold expert inspected the chase next to Mr. Hogan's new cell. *See* dkt. 50-2 at; dkt. 50-6 at 1. That expert found that the chase next to Mr. Hogan's cell had "minor mold growth" but concluded that the overall mold level in the SCU was minimal and "[did] not present a significant concern to the occupants." *See* dkt. 50-6 at 1, 4, 5-6. Defendant Holcomb relied on the expert's report to conclude that the mold present in the SCU did not subject Mr. Hogan to a serious risk of harm. Dkt. 50-3 at 10.

Mr. Hogan's unsworn response states that he collected his own samples of the mold in the second cell and sent it for independent testing in December 2022. Dkt. 56 at 142. The results of the testing indicated that the mold was "allergenic" and could give off gases that may contribute to "headaches and other neurological symptoms." *Id*. Mr. Hogan's unsworn response also states that his asthma worsened and that he "had to have an EKG done" as a result of his exposure to mold. Dkt. 55 at 3. But there is no evidence in the record that he was ever diagnosed with any disease or illness due to his symptoms, no medical professional has ever indicated that his symptoms were caused by mold, and there is no evidence that any defendant prevented him from seeking medical attention for his alleged symptoms or that they were even aware that he was suffering any symptoms. Dkt. 50-1 at 89-100.

### B. Equal Protection

Mr. Hogan contends that Defendants discriminated against him on the basis of his race in his capacity as an inmate detail worker whey they regularly provided him with cleaning supplies that were "insufficient" when they consistently designated him as the last worker to receive

5

supplies. Dkt. 50-1 at 101-104, 112-114. At his deposition, Mr. Hogan had no knowledge regarding whether non-African American SCU detail workers also received supplies in used, soiled condition during the relevant times. *Id*. at 106-108. He also testified that he received cleaning supplies after others had used them and he believes that he was treated differently because none of the Defendants identify as African-American. *Id*. at 101-104, 107-111, 113-114.

## III.
## Discussion

### A. Conditions of Confinement

Under the Eighth Amendment, "prisoners cannot be confined in inhumane conditions." *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). A conditions-of-confinement claim includes both an objective and subjective component. *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019). Under the objective component, a prisoner must show that the conditions were objectively serious and created "an excessive risk to his health and safety." *Id.* (cleaned up). Under the subjective component, a prisoner must establish that the defendants had a culpable state of mind — that they "were subjectively aware of these conditions and refused to take steps to correct them, showing deliberate indifference." *Thomas*, 2 F.4th at 720. Proving the subjective component is a "high hurdle" that "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotations omitted). Neither "negligence [n]or even gross negligence is enough[.]" *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008).

### 1. Sewage

The undisputed record reflects that Mr. Hogan was subjected to approximately 50 incidents of sewage flooding his cell, often for hours at a time. The Seventh Circuit has long recognized that

6

"continued exposure to human excrement can violate the Eighth Amendment." *Hardeman v. Curry*, 933 F.3d 816, 821 (7th Cir. 2019) (citing *DeSpain v. Uphoff*, 264 F.3d 965, 974-75 (10th Cir. 2001) ("Exposure to human waste, like few other conditions of confinement, evokes both the health concerns emphasized in *Farmer* and the more general standards of dignity embodied in the Eighth Amendment.")).

There is no question that the repeated flooding events were objectively serious conditions. Defendants' argument that the sewage did not present any risk of harm to Mr. Hogan because he could avoid the water by sitting on his bunk is appalling. Dkt. 51 at 20 ("At most, Plaintiff's cell was intermittently soaked with only enough wastewater to cover the floor for periods lasting no more than several hours, during which time, Plaintiff could completely avoid the water by sitting on furniture."). It is "obvious" that "exposure to the human waste of others carries a significant risk of contracting infectious diseases." *Shannon v. Graves*, 257 F.3d 1164, 1168 (10th Cir. 2001); *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021) ("Thomas's assertions of feces-covered walls, a lack of hot water, hundreds of dead flies in his bed, and a mattress covered in human waste no doubt establish a material dispute on the objective prong of an Eighth Amendment claim.").

Defendants argue that they responded reasonably to the flooding by taking steps to identify and resolve the cause of the flooding, remove the flood water, and either sanitize the affected cells or provide inmates with supplies necessary to sanitize the cells themselves. Dkt. 50-3 at 6-7. This process sometimes took hours to complete, and sometimes was not completed, due to the severity of the flooding, inadequate staffing or cleaning supplies, and the need for staff to continue to attend to their other assigned duties such as meal delivery. *Id*. at 7.

Defendants argue that Mr. Hogan had "near-constant access to cleaning supplies in the form of soap, water, and extra clothes to use as rags," and such items should be "adequate to

perform basic cell sanitation." Dkt. 51 at 24. But much more than "basic sanitation" was required in response to Mr. Hogan's floor being covered with sewage, and Defendants acknowledge that during sewage floods, the water was often turned off. Dkt. 50-3 at 6. A reasonable juror could conclude that Defendants acted with deliberate indifference to the serious risk presented by the sewage flooding. *Johnson v. Pelker*, 891 F.2d 136, 139−40 (7th Cir. 1989) (reversing summary judgment when a prisoner's request for cleaning supplies were denied while he was held in cell for three days that was smeared with human feces and was without running water).

### 2. Pests

In addition, Mr. Hogan has attested that bugs and rodents infested the SCU after meal trays were not collected in a timely manner after meals. Dkt. 50-1 at 48, 73-74, 76-80. In particular, he testified that he saw mice in his cell on a "couple" of occasions, once when he awoke to a mouse crawling on his bed covers. *Id*. at 78. He also showed Lieutenant Holcomb "termites and bugs in [his] cell . . . at one point." *Id*. at 76.

Significant pest infestations can violate the Eighth Amendment, "[d]epending on how extensive the infestation of a prisoner's cell is, what the infesting pests are, what odors or bites or risk of disease they create, what particular psychological sensitivities the prisoner was known to have, . . . and how long the infestation continues." *Thomas v. Illinois*, 697 F.3d 612, 614 (7th Cir. 2012). However, infrequent exposure to pests may not rise to the level of a constitutional deprivation if not accompanied by sufficient allegations of harm. *See Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008) (prisoner who was incarcerated in the same cell for six years and only saw "several" cockroaches did not establish an objectively serious condition). But even where exposure to pests alone might not constitute a deprivation, courts have held that it may do so where it is combined with other unsanitary or otherwise inadequate conditions. *See Karim*, 2016 WL 910520,

8

at *2 ("numerous allegedly inadequate conditions, including unsanitary cooking and living quarters, the constant presence of vermin, and failure to adequately provide basic cleaning items, taken all together, would amount to an unconstitutional condition of confinement").

Here, no reasonable juror could conclude that Mr. Hogan's infrequent exposure to pests violated the Constitution on its own, but certainly evidence of pests in his unit can be considered at trial as part of his overall conditions of confinement claim.

### 3. Mold

As to the mold issue, there are disputes of material fact as to whether the mold in the SCU posed a risk to Mr. Hogan's health. Prolonged exposure to mold can constitute an objectively serious condition implicating the Eighth Amendment. *See, e.g.*, *Board v. Farnham*, 394 F.3d 469, 486 (7th Cir. 2005) ("There is no question that exposing prisoners to "a ventilation system "contaminated with black mold" "'is contrary to current standards of decency.'") (quoting *Helling v. McKinney*, 609 U.S. 25, 35 (1993)). Although there is no evidence in the record that any medical professional has ever indicated that Mr. Hogan suffered any negative health impacts caused by mold, he testified during his deposition that his exposure to the mold caused him to suffer headaches, difficulty breathing or worsened asthma, nose bleeds, and high blood pressure. Dkt. 50-1 at 92-94. Thus, the Court cannot resolve this issue in favor of the Defendants based on the objective prong of the deliberate indifference analysis.

On the other hand, no reasonable jury could conclude that Defendants acted with deliberate indifference. The question is not whether Defendants resolved the mold problem, but whether they responded reasonably to the risk that mold would present to the inmates in the SCU. *Farmer*, 511 U.S. at 844. Defendants took several steps to address the issue, including:

- Defendant Holcomb sent Defendant Hendrix to inspect the chase next to Mr. Hogan's cell. Dkt. 50-1 at 90.
- Defendant Hendrix concluded that there was no evidence of mold and identified the black residue as a buildup of dust or dirt. *Id*.
- Wabash Valley contracted with an outside expert to test for mold in the SCU, and that testing revealed only minor areas of mold growth that were not expected to impact inmate health. Dkt. 50-6 at 1, 4, 5-6.
- Inmates were provided cleaning products, although Mr. Hogan disputes their adequacy.

This case does not present a situation where Defendants "were subjectively aware of [unconstitutional] conditions and refused to take steps to correct them, showing deliberate indifference." *Thomas*, 2 F.4th at 720. Rather, Defendants attempted to take meaningful steps to locate mold and determine if it posed a risk to inmate health. Accordingly, Defendants are entitled to summary judgment on this component of Mr. Hogan's conditions claim.

### 4. Response to Grievances about the Conditions

Mr. Hogan's complaint alleged that grievance officers Crichfield, Templeton, and Wellington violated his constitutional rights by denying or ignoring the numerous grievances he filed related to the conditions in the SCU. These Defendants seek summary judgment, arguing that they appropriately responded to Mr. Hogan's grievances by either investigating them or rejecting them based on the prison grievance policy. They support their arguments with grievance records. Dkt. 50-5. These records confirm that the grievance officers responded to Mr. Hogan's grievances after requesting responses from Lt. Holcomb. *See, e.g.*, dkt. 50-5 at 115 (response to grievance regarding dirty mop heads documenting that Lt. Holcomb confirmed that the "mops may look used

but they have been properly sanitized."). In other instances, these Defendants rejected grievances for basic violations of the grievance policy. Dkt. 50-5 at 138 (rejected because Mr. Hogan provided an incorrect inmate identification number); *Id*. at 148 (rejecting repetitive grievance regarding inadequate cleaning supplies).

Prison officials may violate the Constitution if their failure to adequately investigate a prisoner's grievances delays resolution of his complaint. *Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015). On the other hand, if a prison official reasonably responds to a prisoner's complaints, then she lacks a "sufficiently culpable state of mind" to be deliberately indifferent. *Johnson v. Doughty*, 433 F.3d 1001, 1010-11 (7th Cir. 2006) (finding grievance counselor did not violate the Eighth Amendment where he researched inmate's complaint, learned that medical professionals had seen and diagnosed inmate with medical condition and determined that surgery was not required); *see also Burks v. Raemisch*, 555 F.3d 592, 594-95 (7th Cir. 2009) (affirming grant of summary judgment to prison complaint examiner who denied grievance as untimely "because she carried out her job exactly as she was supposed to"). No reasonable juror could conclude from the evidence in the record that Defendants Crichfield, Templeton, or Wellington acted with deliberate indifference to the constitutional violations alleged in Mr. Hogan's grievances. They are therefore entitled to summary judgment.

### B. First Amendment Religious Free Exercise

To succeed on his First Amendment free-exercise claim, Mr. Hogan must convince the factfinder that Defendants "personally and unjustifiably placed a substantial burden on his religious practices." *Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016). "A substantial burden puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* (cleaned up). An isolated instance that impacts an inmate's religious practice will often be

"de minimis" and "not of constitutional dimension." *Rapier v. Harris*, 172 F.3d 999, 1006 n.4 (7th Cir. 1999) (denial of pork-free meals on three isolated occasions "does not constitute more than a de minimis burden on [plaintiff's] free exercise of religion").

In addition, a prison "may restrict the inmate's practices if its legitimate penological interests outweigh the prisoner's religious interests." *Kaufman v. McCaughtry*, 419 F.3d 678, 683 (7th Cir. 2005). Thus, even a substantial burden is permitted if the burden is "reasonably related to legitimate penological objectives." *Vinning-El v. Evans*, 657 F.3d 591, 592−93 (7th Cir. 2011) (citing *Turner v. Safley*, 482 U.S. 78, 89−91 (1987)). "Courts consider four factors when evaluating a prison policy against a First Amendment claim: (1) whether the policy rationally relates to a legitimate governmental objective; (2) whether the inmate has alternative means of exercising the right; (3) the impact that accommodating the right will have on security; and (4) whether ready alternatives exist to the prison's policy." *Larry v. Goldsmith*, 799 F. App'x 413, 415 (7th Cir. 2020); *see Turner*, 482 U.S. at 89−91 (outlining similar factors).

Defendants first argue that they did not substantially burden Mr. Hogan's religious practice because he faced only de minimis interference with his meals on three occasions in more than a year. Dkt. 51 at 31. An isolated instance that impacts an inmate's religious practice will often be "de minimis" and "not of constitutional dimension." *Rapier*, 172 F.3d at 1006 n.4 . No reasonable juror could conclude that Defendants substantially burdened Mr. Hogan's religious practice by failing to provide a clean area in which to eat three meals in over a year. They are entitled to summary judgment on this portion of his First Amendment claim.

Defendants also argue that they are entitled to summary judgment on Mr. Hogan's claim regarding the interruptions to his daily prayers caused by the sewage flooding because he has not explained why he could not clean his cell with the materials available: soap, his extra clothes, and

potentially water if it had not been shut off in response to a flood. *Id*. at 31. As already discussed, a reasonable juror could conclude that a few pieces of extra clothing and soap would be inadequate to cleanse and sanitize Mr. Hogan's floor for prayers after it was flooded with enough sewage to cover the floor. In addition, Defendants' argument that Mr. Hogan could have simply prayed at another time, *id*. at 34 ("there is no evidence to indicate that Plaintiff could not conduct his missed prayers once the flood water was removed"), demonstrates a basic lack of understanding of the requirements of the Islamic faith and requires no further consideration. Mr. Hogan testified at his deposition that the five daily prayers times were a mandatory feature of his faith. Dkt. 50-1 at 38. A reasonable jury believing his testimony could find that Mr. Hogan's religious practice was substantially burdened by his repeated lack of access to a clean area to pray.

Defendants argue that they are nevertheless entitled to summary judgment because the delays in removing flood water and Mr. Hogan's limited access to cleaning supplies were rationally related to legitimate penological interests, namely maintaining order while understaffed and facing shortages in cleaning supplies. *Id*. at 33. Defendants focus their argument on the shortages in staff and cleaning supplies. Certainly, prisons must prioritize security and order, particularly when they are short-staffed. But beyond that, it is difficult to apply the *Turner* factors, which focus on analyzing a prison policy, to this case. To the extent it could be argued that Defendants implemented a policy of prioritizing security tasks and meal delivery over cell sanitation, Defendants have not addressed whether accommodating Mr. Hogan's need to pray throughout the day in a clean area could have been accommodated with minimal impacts on prison security and timely meal delivery to other inmates. Instead, they focus inmates' limited access to supplies to clean their cells without explaining why they could not have moved Mr. Hogan to a clean holding cell for prayer times when the lack of time and cleaning supplies prevented him from praying in

his cell. *See Turner*, 482 U.S. at 90 (noting that "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable"). A reasonable juror could conclude that Defendants' failure to provide a clean prayer space violated his First Amendment rights. Therefore, Defendants' motion for summary judgment on this claim is **denied**.

### C. RLUIPA Claim

At screening, the Court permitted Mr. Hogan to proceed with a RLUIPA claim for injunctive relief against the Warden in his official capacity. Defendants argue that this claim is now moot because Mr. Hogan was transferred to a different facility in December 2022. Dkt. 51 at 29, citing dkt. 50-1 at 8. "[W]hen a prisoner who seeks injunctive relief for a condition specific to a particular prison is transferred out of that prison, the need for relief . . . become[s] moot." *Lehn v. Holmes*, 364 F.3d 862, 871 (7th Cir. 2004). Thus, Mr. Hogan's RLUIPA claim is **dismissed as moot**.

### D. Equal Protection Claims

Mr. Hogan contends that Defendants discriminated against him on the basis of his race by regularly providing him with cleaning supplies that were "insufficient" due to them being diluted or previously used and because they consistently designated him as the last worker to receive supplies on a given shift. Dkt. 50-1 at 101-104, 112-114.

"The Equal Protection Clause of the Fourteenth Amendment prohibits intentional and arbitrary discrimination." *Dunnet Bay Const. Co. v. Borggren*, 799 F.3d 676, 696 (7th Cir. 2015). To survive summary judgment for his equal protection claim, Mr. Hogan must show that (1) he was a member of a protected class, (2) he was treated differently from a similarly situated member of an unprotected class, and (3) the defendants were motivated by a discriminatory purpose. *Alston v. City of Madison*, 853 F.3d 901, 906 (7th Cir. 2017).

Mr. Hogan is African American, and he alleges that he was treated differently from white inmates because (1) he received "insufficient" cleaning supplies, and (2) he consistently received the supplies last. "Protection from disparate treatment based upon race does not vanish merely because a person is incarcerated." *Lisle v. Welborn*, 933 F.3d 705, 719 (7th Cir. 2019). But to avoid summary judgment, Mr. Hogan must "come forward with evidence that would allow a reasonable jury to infer that the defendants intentionally treated him differently because of his race." *Id.*

Mr. Hogan has introduced no evidence that he received different cleaning supplies than other inmates or that he actually received the supplies last. At his deposition, he had no knowledge regarding whether non-African American SCU detail workers also received supplies in used, soiled condition or whether other African American SCU detail workers received supplies before him. Dkt. 50-1 at 106-108; 111-112. He also testified that his belief that he received the cleaning supplies last was based on officers bringing him used mops from another range. *Id*. at 109. Mr. Hogan's "claim of race discrimination is supported only by speculation and conjecture, which is not enough to survive summary judgment." *Lisle*, 933 F.3d at 720. Defendants are entitled to summary judgment on this claim.

### IV.
### Conclusion

Defendants' motion for summary judgment, dkt. [49], is **GRANTED** as to the following claims:

- All claims against Defendants Crichfield, Templeton, and Wellington;
- First Amendment claim regarding the failure to provide a clean eating space on three occasions;
- Eighth Amendment mold claim;
- Fourteenth Amendment equal protection claim; and

- RLUIPUA injunctive relief claim against the Warden.

The motion is **DENIED** as to the following claims:

- Eighth Amendment conditions claim regarding Mr. Hogan's exposure to sewage and pests and lack of cleaning supplies; and

- First Amendment free exercise claim as to his lack of access to a clean area for prayers.

These claims will be decided through settlement or a jury trial if necessary. Because it is the Court's preference that the plaintiff be represented by counsel for trial or any potential settlement conference or trial, the Court will attempt to recruit counsel to represent the plaintiff. The plaintiff shall have **through September 26, 2024,** in which to file a motion for recruitment of counsel or object to the recruitment of counsel on his behalf. **The clerk is directed** to include the motion for counsel form with the plaintiff's copy of this Order.

After counsel has been appointed, the Magistrate Judge is asked to hold a settlement conference.

**IT IS SO ORDERED.**

Date: 8/29/2024

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

RASHAAD HOGAN
166825
INDIANA STATE PRISON
INDIANA STATE PRISON
Electronic Service Participant – Court Only

Carlton Wayne Anker
Lewis and Wilkins LLP
anker@lewisandwilkins.com

Laura Brown
Lewis and Wilkins LLP
brown@lewisandwilkins.com

Eric Ryan Shouse
Lewis And Wilkins LLP
shouse@lewisandwilkins.com

Magistrate Judge Mark J. Dinsmore